IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TINA K. THOMAS, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PAUL M. COADY, M.D., et al. | : | NO.  08-339 |

### MEMORANDUM AND ORDER

M. FAITH ANGELL                                                    April 23, 2010
UNITED STATES MAGISTRATE JUDGE

## I.  Introduction.

In this medical malpractice case, Plaintiffs allege that Defendants failed to diagnose and treat a femoral artery occlusion of Plaintiff Tina Thomas' right leg following cardiac catheterization.  The matter was tried by jury, before me, in December 2009.  On December 29, 2009, the jury returned a verdict in the amount of $5,157,934.00 against Paul M. Coady, M.D. and Lankenau Hospital, finding Dr. Coady seventeen percent (17%) negligent and Lankenau Hospital eighty-three percent (83%) negligent.  Presently before this Court are Defendants' Motions For A New Trial, Or In The Alternative, For Remittitur And Renewed Motions For Judgment As A Matter Of Law.[1]  For the reasons which follow, Defendants' renewed motions for judgment as a matter of law and for a new trial are denied, and Defendants' motions for remittitur are granted.

---

[1] Dr. Coady and Lankenau Hospital have filed separate post-trial motions, however, the arguments raised in each are similar.  In this opinion, I will refer to Dr. Coady and Lankenau Hospital jointly as "Defendants," unless otherwise noted.

**II. Background.**

Plaintiff Tina Thomas is a 45 year old registered nurse with a longstanding history of supraventricular tachycardia. In early 2006, Mrs. Thomas' primary cardiologist, Dr. Pedro Perez, referred her for a cardiac catheterization. After speaking with a former colleague, Dr. Eranga Haththotuwa, a cardiologist who had relocated to Lankenau Hospital, Mrs. Thomas decided to have the procedure done there.

On January 23, 2006, Mrs. Thomas underwent a diagnostic cardiac catheterization at Lankenau Hospital. Dr. Paul Coady was scheduled to cover the cardiac catheterization lab on that date, as was Dr. Ajay Joshi, an interventional cardiology fellow.

When Mrs. Thomas arrived at the cardiac catheterization lab, she was examined and a pre-procedure assessment was done. After Dr. Coady reviewed the procedure and risks with Mrs. Thomas, she was taken to the catheterization suite and given light sedation.

The catheterization procedure was performed by Dr. Joshi under the supervision of Dr. Coady. Dr. Coady was present at the foot of the bed, watching Mrs. Thomas' monitors. Access was obtained through the right groin. A coronary angiography did not show any evidence of coronary artery disease. At the end of the catheterization procedure, a routine femoral arteriogram was performed. After reviewing the arteriogram and consulting with one of his partners (Dr. Sean Janzer), Dr. Coady diagnosed the femoral artery as being in spasm. He directed Dr. Joshi to inject the artery with nitroglycerin to relieve the spasm. Mrs. Thomas was monitored in the holding area and then transferred to the post procedure floor. Carol Richardson, R.N., evaluated Mrs. Thomas on the post procedure floor before her discharge and determined that ambulation protocol had been met.

Three days after her discharge, Mrs. Thomas called Dr. Perez, her treating cardiologist, complaining of pain and weakness in her right leg. Dr. Perez instructed Mrs. Thomas to get an ultrasound of her right leg. Plaintiff saw Dr. Perez on January 27, 2006, to review the results of the ultrasound. After her visit with Dr. Perez, Mrs. Thomas called Dr. Haththotuwa, who in turn spoke to his partner, Dr. Coady.

Mrs. Thomas was seen on February 2, 2006, by Dr. Coady's partner, Dr. Sean Janzer. After additional testing and evaluation, Dr. Janzer determined that Mrs. Thomas had an occlusion of the femoral artery. On February 3, 2006, Dr. Alexander Uribe, a vascular surgeon, performed surgical intervention.

Plaintiffs allege that as a result of the deprivation of blood to Mrs. Thomas' right leg from January 23, 2006 until February 3, 2006, Mrs. Thomas suffered a permanent ischemic injury to her leg, resulting in extreme pain, weakness and fatigue.

**III Legal Standards.**

While some of the post-trial arguments are overlapping, each motion has a different standard of review.

**A. Judgment As A Matter Of Law.**

Rule 50 of the Federal Rules of Civil Procedure addresses the Court's ability to grant a motion for judgment as a matter of law following a jury trial. Judgment as a matter of law is appropriate only where "a party has been fully heard on an issue during a jury trial and the Court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." *Fed.R.Civ.Pro. 50(a)(1).*

"In determining whether such a legally sufficient evidentiary basis exists, the Court must review all the evidence in the record and draw all reasonable inferences in favor of the non-moving party. [ . . . ] The Court may not, however, make credibility determination or weigh the evidence - those functions are reserved for the jury. [ . . . ] In sum, a motion for [judgment as a matter of law] 'should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.' [page citations to caselaw omitted]"

*Reynolds v. University of Pennsylvania*, CA No. 06-1237, 2010 WL 308980 at *2 (E.D. Pa. January 27, 2010)(citing *Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 120 S.Ct. 2097 (2000) and quoting *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1166 (3d Cir. 1993)).

A Court may grant judgment as a matter of law only if "the record is critically deficient of the minimum quantum of evidence" to sustain a verdict. *Acumed LLC v. Advanced Surgical Services, Inc.*, 561 F.3d 199, 211 (3d Cir. 2009).

**B.  Grant Of A New Trial.**

The grant of a new trial is governed by Rule 59 of the Federal Rules of Civil Procedure. The Court may grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." *Fed.R.Civ.Pro. 59(a)(1)(A).*

"A new trial may be granted 'when the verdict is contrary to the great weight of the evidence; that is where a miscarriage of justice would result if the verdict were to stand' or when the court believes the verdict results from jury confusion."

*Brown v. Nutrition Management Svcs Co.,* CA No. 08-3840, 2010 WL 939935 at * 2 (3d Cir. March 17, 2010)(quoting *Pryer v. C.O. 3 Slavic*, 251 F.3d 448, 453 (3d Cir. 2001).

**C. Remittitur**.

Federal law governs the decision of whether a remittitur should be granted in a diversity case. *Graziani v. Star C. Trucking,* Civ. A. 94-7124, 1996 WL 79975 at *3 n.6 (E.D. Pa. February 22, 1996)(citing *Kazan v. Wolinski,* 721 F.2d 911, 913 (3d Cir. 1983)), *aff'd*, 103 F.3d 112 (3d Cir. 1996).

In reviewing a damage award, the trial court must uphold the jury's award if there exists a reasonable basis to do so. However, the court has a responsibility to see that jury awards do not extend beyond all reasonable bounds. *Hayes v. Cha*, 338 F.Supp.2d 470, 510 (D.N.J. 2004)(citing 3d Circuit caselaw). The Third Circuit has recognized "an increasing appellate trend to review the merits of a damage award, even though the scope of review is limited." *Evans v. Port Authority of New York,* 273 F.3d 346, 354 (3d Cir. 2001).

The trial court may, in the exercise of its discretion, use its remittitur power to reduce a jury award "only if the verdict is so grossly excessive as to shock the judicial conscience." *Williams v. Martin Marietta Alumina*, 817 F.2d 1030, 1038 (3d Cir. 1987)(quoting *Walters v. Mintec/International*, 758 F.2d 73, 80 (3d Cir. 1985)). Remittitur should be set at the "maximum recovery that does not shock the judicial conscience." *Evans*, 273 F.3d at p. 354 (3d Cir. 2001).

The trial court must make a detailed appraisal of the evidence bearing on damages, and may evaluate the record in light of damage awards rendered in other cases. *See Rivera v. Virgin Islands Housing Authority,* 854 F.2d 24, 28 (3d Cir. 1988) and *Evans*, 273 F.3d at 356 (3d Cir. 2001)(affirming the trial court's remittitur decision as the trial court "endeavored to follow [our] instructions, consider similar cases, evaluate the evidence and determine a damages figure that [was] rationally related to [that] evidence, mindful that [t]he determination of that amount may not be precisely calculated.").

**IV Analysis.**

   **A.  Defendants Are Not Entitled To Judgment As A Matter of Law.**

Defendants have renewed their motion for judgment as a matter of law, arguing that the testimony of Plaintiffs' experts exhibited "fundamental contradictions," causing a speculative verdict to be rendered in this case.  *Brief In Support Of The Motion Of Defendants, Paul M. Coady, M.D. And Cardiovascular Associates Of Southeastern Pennsylvania, For A New Trial Or, In The Alternative, For Remittitur And Renewed Motion For Judgment As A Matter Of Law* [Docket Entry No. 149][2] at p. 25. *See also Brief In Support Of The Motion Of Defendant, Main Line Hospitals, Inc. d/b/a The Lankenau Hospital For A New Trial Or, In The Alternative For Remittitur And Renewed Motion For Judgment As A Matter Of Law* [Docket Entry No. 147][3] at p. 40 ("[T]he testimony of Mrs. Thomas' liability expert witnesses was so contradictory on essential issues that any finding by the jury was likely based upon mere speculation.").

According to Defendants:

> "Mrs. Thomas presented two experts who absolutely contradicted one another on the key issue of this case – whether a dissection was diagnosable on January 23, 2006.  This is vitally important because absent a dissection, the follow-up care provided to Mrs. Thomas following her catheterization was appropriate according to Mrs. Thomas' own experts.  Thus, if there was no dissection diagnosable immediately following her procedure, there can be no violation of the standard of care and, therefore, no causation.
>    In summary, the fundamental issue in this case is whether a dissection was diagnosable on January 23, 2006.  One expert says yes; the other said, no you cannot tell.  This conflicting, contradictory expert testimony did nothing to assist the jury, and forced the jury to speculate on the ultimate issue in the case.  The absolute contradiction in this case regarding whether dissection is seen on the arteriogram is critical as it necessarily precedes the issue of whether the follow-up

---

[2]        Hereinafter "Defendant Coady's Post-Verdict Motion."

[3]        Hereinafter "Defendant Lankenau Hospital's Post-Verdict Motion."

care breached the standard of care, and it goes directly to whether there was a delay in diagnosis of Plaintiff's post-surgical complications. Having elected to proceed with two experts, Plaintiffs must not present conflicting testimony. Having presented conflicting testimony, the opinion of both experts cancel each other out, and Plaintiffs should not have been permitted to proceed. Rather, judgment as a matter of law was justified and should have been granted."

*Defendant Lankenau Hospital's Post-Verdict Motion* at pp. 43-44.[4]

Defendants are incorrect. Both Dr. Collier and Dr. Shubrooks testified that Mrs. Thomas' arteriogram showed an area of reduced blood flow after the catheterization caused by either dissection or spasm. *See N.T. 12/16/09* at pp. 62, 66 (Testimony of Dr. Shubrooks in which he states that looking at the "area of concern" on the arteriogram, "[t]he differential diagnosis for this narrowing is either dissection or spasm," and that looking at the arteriogram, you can't rule out the diagnosis of dissection.) and *N.T. 12/16/09* at p. 219 (Testimony of Dr. Collier in which he states that the arteriogram shows a "defect in the superficial femoral artery," but "you can't really tell from [the arteriogram] if it's a dissection or a spasm.").

Dr. Shubrooks, who was offered and accepted as an expert in interventional and invasive cardiology, opined that given the differential diagnosis, the accepted standard of care required Dr. Coady and Dr. Joshi to follow Mrs. Thomas and do appropriate studies to rule out a dissection before she was discharged from the hospital. *Id.* at pp. 22, 66, 69, 77, 80. According

---

[4]     Defendant Coady argues: "[ . . . ] Plaintiff's cardiology expert, Dr. Shubrooks testified that Plaintiff suffered a dissection during the cardiac catheterization, as shown on the arteriogram, and that it was a violation of the standard of care to discharge her on January 23, 2006 without ruling out a dissection of the femoral artery. [ . . . ] Ultimately, Dr. Shubrooks concluded that a dissection was clearly evident on the arteriogram. Whereas, on the contrary, Plaintiffs' other expert, Dr. Collier, could [not] conclude from looking at the arteriogram on January 23, 2006 or the ultrasound days later whether Plaintiff in fact had a dissection. [ . . . ] It was not until Dr. Collier reviewed this matter retrospectively (ie. after he knew all the facts and the ultimate outcome) did he determine that there was a dissection. [citations to transcript omitted]" *Defendant Coady's Post-Verdict Motion* at p. 26.

to Dr. Shubrooks, they also should have alerted the nursing staff who was doing Mrs. Thomas' follow-up, and Mrs. Thomas herself, as to the complication and potential dissection. *Id.* at pp. 66-68, 81.[5]

Based upon my review of the evidence, I find that there is no contradiction in the testimony of Plaintiffs' experts, there is sufficient evidence from which a jury reasonably could have found causation, and Defendants are not entitled to judgment as a matter of law on this basis.

**B. Defendants Are Not Entitled To A New Trial.**

Defendants argue that they are entitled to a new trial for the following reasons: (1) the verdict was against the overwhelming weight of the evidence, (2) juror misconduct; (3) the trial court erred when it refused to instruct the jury that a physician is not a warrantor or guarantor of results; (4) the trial court erred when it refused to instruct the jury that a physician is not liable for mistakes or errors of judgment, nor do they guarantee a result; (5) the trial court erred when it refused to instruct the jury that Dr. Perez' actions were a superceding/intervening cause of Plaintiff's injury; and (6) there is a strong likelihood that the jury verdict was influenced by Plaintiffs' Counsel's improper attempts to inject corporate liability issues into the trial.

1.  The Jury Verdict Is Not Against The Weight Of The Evidence.

"When the asserted basis for a new trial is that the jury verdict is against the weight of the evidence, 'the district court ought to grant a new trial only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.' *Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir. 1993); *EEOC v. Delaware Dept. Of Health And Social Svcs.,* 865 F.2d 1408, 1413 (3d Cir. 1989). In making this

_____

[5]     Dr. Collier was offered and accepted as an expert in the field of vascular surgery, and did not testify as to standard of care. *N.T. 12/16/09* at pp. 197, 220.

determination, the Court should consider the character and complexity of the evidence that the jury considered; the Court has less leeway to substitute its judgment for that of the jury where the subject of the litigation is 'easily comprehended by any intelligent layman.' *See Lind*, 278 F.2d at 88-91."

*Gunyup v. Lancaster County,* Civil Action No. 06-4315, 2009 WL 541533 at *2 (E.D. Pa. March 3, 2009).

This standard provides due respect for the jury's primary function as a factfinder.

*Reynolds*, 2010 WL 308980 at *3 (E.D. Pa. January 27, 2010).

Defendant Coady argues:

"The verdict in this matter was against the clear weight of the evidence. Specifically, when viewed in the light most favorable to the Plaintiffs, the evidence showed, at best, the Dr. Coady made an error in judgment in diagnosing Plaintiff with a spasm as opposed to a dissection on January 23, 2006. Particularly where Plaintiff's own expert, Dr. Collier, conceded that he could not tell from the films as to whether the diminished blood flow was from a spasm or a dissection. (N.T. 12/17/09 p. 13, 17). The jury's liability finding against Dr. Coady was against the clear weight of the evidence."

*Defendant Coady's Post-Verdict Motion* at p. 6.

Defendant Coady fails to provide a compelling argument that the jury's verdict resulted in a miscarriage of justice, cries out to be overturned or shocks the Court's conscience. Plaintiffs presented evidence that Dr. Coady failed to meet the applicable standard of care when he did not follow up to rule out a dissection in light of his differential diagnosis following Mrs. Thomas' catheterization, and did not advise either the nursing staff nor Mrs. Thomas of the possible complication. The jury was free to accept this evidence and return a verdict in Plaintiffs' favor. As I find that the verdict is not against the weight of the evidence, I will deny Defendant Coady's request for a new trial on this basis.

2.  The Court's Failure To Conduct Additional *Voir Dire* Of The Remaining
Jurors After Discharging Juror No. 6 Does Not Warrant A New Trial.

The jury began deliberating on December 23, 2009 at approximately 4:00 p.m.  At around

6:00 p.m., the jury requested permission to adjourn for the day, to return on December 29, 2009

to continue their deliberations.  This request was granted by the Court, without objection from

any Counsel.

On December 29, 2009, the jury reconvened at 9:00 a.m.  They sent a question to the

Court which was read into the record at approximately 9:15 a.m., asking for copies of Plaintiffs'

exhibits related to lost earnings and a life care plan.  In responding to the request, I polled the

jurors as follows:

> "Oh, the one thing I want to do is poll you, if you don't mind.  I want to make sure
> you didn't discuss this matter with anybody else over the period of time."

*N.T. 12/29/09* at p. 3.  Seven of the eight jurors affirmed that they had not discuss this case with

anyone else during the holiday break, however, Juror Number Six stated:

> "I did with my husband, but he did not say anything one way or the other. [ . . . ]
> He said I should just go by what I – how I remembered the trial.  We did not say
> or discuss anything beyond that.  And I didn't say anymore."

*Id.* at p. 4.

All jurors except Juror Number 6 were then sent out to the jury room with instructions

not to deliberate until further notice.  I conducted a colloquy of Juror Number Six as follows:

> "COURT: Tell me and counsel exactly how this went down, exactly what you said
> to him and what his response was to you.
>
> JUROR NUMBER SIX: Again, I don't remember exactly, but I think I discussed
> some of the similarities between the plaintiff and myself.  I discussed some of the
> frustration between, you know, listening to each side and having one – some of it
> was, but I'm telling you the truth.

COURT: All right.

JUROR NUMBER SIX: And how, you know, for me, the reason why I did that is because I have a hard time just thinking through my head and not saying – it was more like a sounding board. He didn't make any – let me see – he did not make – he said, do not, you know – even through I said something to him, I told him, also, that – or he told me, actually, that I should go by what was in my head and what was in my notes, not to go by, you know – he really didn't – I really didn't – even though I mentioned it, he did not make any assumptions or any – say, you should do this or you should do that kind of thing.

Let me think. That's pretty much – just so you know, I have a hard time sorting things out, without saying things out loud. It helps me to sort my mind out. And he was – he was, like, mostly asleep when I talked to him about it anyway, as soon as he hit the pillow, but I just needed to say it out loud so I could get it straight in my head, all the facts and stuff. But I didn't say all the facts, just kind of a generalization.

COURT: Did you mention to any of the jurors before we convened that you had spoken to your husband?

JUROR NUMBER SIX: No.

COURT: All right.

JUROR NUMBER SIX: Nothing that was said swayed me one way or the other. I just needed –

COURT: You knew I had instructed –

JUROR NUMBER SIX: Not to say anything to anybody, yes, you did.

COURT: Right. Yes.

JUROR NUMBER SIX: The only thing I can say is I apologize for that fact.

COURT: Okay. I am going to excuse you, but I am going to ask you to sit somewhere else other than with the jury at this point.

JUROR NUMBER SIX: Oh, really?

COURT: Well, I need to decide what to do, because this is an issue that has to be resolved by me, and it's going to take me a little time, because I need to look at

the case law on this.  I don't want the jury deliberating while I am doing this until I come to a decision.

　　　　　And I don't want anything to prejudice the jury, because they know now that I am inquiring you, and you may be upset.  And they may be upset because you are upset.  So the only reason I am segregating you at this point is I don't want any aspect to add to what is going on.  Okay?

JUROR NUMBER SIX: Okay."

*N.T. 12/29/09* at pp. 6-8.

After the colloquy, Plaintiffs' Counsel argued that Juror Number Six was not tainted and that a passing comment to her husband caused no prejudice.  Counsel for Defendants moved for a mistrial.  I reviewed the caselaw and heard further argument (outside the hearing of the jury).  *Id.* at pp. 15-23.

I initially granted a mistrial, concluding that Juror Number Six had violated my instructions by seeking validation from her husband and that she could not continue as a juror.  I asked Counsel for Defendants if they would agree to proceed with less than eight jurors, and they declined to do so.  *Id.* at pp. 23-35.  Plaintiffs' Counsel then argued that consent from opposing counsel to proceed with seven jurors was not necessary.  He requested an opportunity to provide authority in support of Plaintiffs' argument, which I granted.  *N.T. 12/29/10* at pp. 35-39.

After reviewing the relevant authority, I excused Juror Number Six and determined that consent was **not** required to proceed with seven jurors.  Counsel for Defendants argued that because Juror Number Six had been in the jury room that morning before she was polled, the entire jury was tainted and the grant of a mistrial should stand.  *Id.* at pp. 40-46.  I reversed the grant of a mistrial, brought the remaining seven jurors back in and instructed them as follows:

"Jurors, the Court has made a legal determination that one of the jurors must be excused.  This legal decision must not have any influence on your

deliberations.  You are bound by the jury instructions I have previously given to you.  You are now to return to the jury room to deliberate."

*N.T. 12/29/10* at p. 47.

In their post-verdict motions, Defendants argue that the Court erred by failing to query the remaining seven jurors "either *en banc* or individually, as to what they may have been told by Juror No. 6, even though the misconduct had been discovered after Juror No. 6 had actively engaged in deliberations."  *Defendant Lankenau Hospital's Post-Verdict Motion* at p. 25.

Defendant Coady argues:

"[B]efore vacating the prior ruling the trial court, at minimum, should have conducted *voir dire* of the remaining jurors to evaluate and the extent of the juror's misconduct [*sic*].  *See U.S. ex rel. Greene v. New Jersey*, 519 F.2d 1356, 1357 (3d Cir. 1975)(new trial warranted where the trial court did not conduct a *voir dire* could not speculate as to what the jurors' responses would have been.).

Instead, the trial court assumed that the tainted juror did not speak with any other members of the jury ignoring the fact that the jury started deliberating for twenty (20) minutes before they were polled.  Without conducting *voir dire* of all the jurors, we have no way of knowing what was or not said and what each member of the jury knew or did not know about the conversation Juror Number Six had with her husband.  Nothing is left but speculation.  We have no idea whether any members of the jury obtained any new information nor do we know with specificity whether Juror Number Six obtained any new information from her husband.

This juror was clearly tainted; she deliberately failed to follow the trial court's explicit instructions to the detriment of the Defendants then hesitated in her responses to the Court.  Speaking to her husband about the facts of the case certainly relates to the central issues of the case.  Also, her conversation with her husband was emotional since it was evident that she was looking to her husband to validate her position in relation to the plaintiff.  Two of the three prongs set forth in *Carter* are established in this case.  Her conversation had the potential to influence her thought process and a mistrial should have been upheld because this tainted juror deliberated for twenty minutes on Day 8 of the trial before being dismissed.

Failure of the trial court to investigate the extent of the misconduct, the Court committed reversible error and should thereby grant Defendants a new trial."

*Defendant Coady's Post-Verdict Motion* at p. 15.

When juror misconduct is a concern, the proper procedure is for the trial court to determine whether the misconduct actually occurred and then to determine whether the misconduct, if any, is prejudicial. *United States v. Rodriguez*, 151 Fed.Appx. 182, 184 (3d Cir. 2005)(citing *United States v. Resko,* 3 F.3d 684, 691 (3d Cir. 1993)), *cert. denied,* 126 S.Ct. 1668 (2006).

"The trial judge has discretion to determine '[w]hether and to what extent a juror should be questioned regarding the circumstances of a need to be excused.'" *Id.* (quoting *United States v. Reese,* 33 F.3d 166, 173 (2d Cir. 1994)). In determining whether to *voir dire* the entire jury, the trial court must "balance the potential benefits of further investigation against the possible harm of calling attention to a relatively minor situation about which the other jurors may have been unaware." *Id.* (quoting *United States v. Bertoli*, 40 F.3d 1384, 1395 (3d Cir. 1994)).

In this case, as soon as Juror Number Six acknowledged that she had discussed the case with her husband, the remaining jurors were excused and directed not to conduct further deliberations. I conducted a *voir dire* of Juror Number Six and determined that she had violated my instructions by seeking validation from her husband and, as a result, could not continue as a juror. I further determined that the jury had not been provided with extraneous information. *See N.T. 12/29/09* at pp. 15-16, and 19.[6]

_____

[6]     I specifically found that the second *Carter* factor, "whether the extraneous influence provided the jury with information they did not have before them at trial," was not met. *N.T. 12/29/09* at pp. 15-16. When Plaintiffs' Counsel argued that Juror Number Six "said she had no discussion with any of the other jurors. And none of the other jurors have any potential taint by this one juror [ . . . ]," I agreed. *Id.* at p. 19.

Counsel for Defendants argued that a mistrial should be granted. They argued that excusing Juror Number Six would be prejudicial to the Defendants because Juror Number Six had been in the juror room for at least twenty minutes before she was polled, and the remaining jurors would know that Defendants wanted Juror Number Six removed. There was no request to poll the remaining jurors as to any extraneous influence related to Juror Number Six. In light of my specific finding that Juror Number Six did not provide any extraneous information to the other jurors, such a request would have been denied.[7] After excusing Juror Number Six, I charged the remaining jurors that this was a legal decision made by the Court which could not have any influence on their deliberations, and reiterated that the jurors were bound by the jury instructions that I had given them prior to beginning deliberations. Under these circumstances, I find that I did not commit reversible error in excusing Juror Number Six as tainted and permitting deliberations to proceed with the seven remaining jurors, without conducting any *voir dire* of the remaining jurors.

---

[7]     This finding is consistent with the testimony of Juror Number Six in which she stated that prior to being polled she did not mention to any of the other jurors that she had spoken to her husband. *N.T. 12/29/09* at p. 7.

        Defendants assert that I noted Juror Number Six's hesitation in responding to my question as to whether she had discussed the conversation with her husband with any of the other jurors. *Defendant Lankenau Hospital's Post-Verdict Motion* at p. 24. I did note that Juror Number Six had hesitated in responding to my questions about what she discussed with her husband and weighed this fact into my assessment of whether she had to be removed as a juror. However, I specifically found, consistent with her testimony, that Juror Number Six had not spoken to the other jurors about the conversation with her husband.

3.  The Court's Failure To Given Requested Jury Instructions Does Not
Warrant A New Trial.

Defendants argue that the Court erred in failing to give the following jury instructions: (1)

"an error of judgment" charge; (2) an instruction that a physician is not a guarantor of results; and

(3) an instruction that Dr. Perez' actions were a superceding/intervening cause of Plaintiff Tina

Thomas' injuries.

> "A party is entitled to a jury instruction that accurately and fairly sets forth
> the current status of the law.  *See McPhee v. Reichel*, 461 F/2d 947, 950 (3d Cir.
> 1972)('It is the responsibility of the trial judge to provide the jury with a clear and
> accurate statement of the law . . . '); *Resolution Trust Corp. v. Eason,* 17 F.3d
> 1126, 1132 (8th Cir. 1994)(as long as the entire charge fairly and adequately
> contains law applicable to the case, judgment will not be disturbed on appeal);
> *Harrison v. Otis Elevator Co.,* 935 F.2d 714, 717 (5th Cir. 1991)(trial court has
> broad discretion to compose jury instructions, as long as they are fundamentally
> accurate and not misleading).  No litigant has the right to a jury instruction of its
> choice, or precisely in the manner and words of its own preference.  *See Heller
> Int'l Corp v. Sharp*, 974 F.2d 850, 860 (7th Cir. 1992)(district court has substantial
> discretion with respect to specific wording of jury instructions and need not give
> proposed instruction if essential points are covered by those that are given);
> *Anderson v. Branen*, 17 F.3d 552, 559-60 (2d Cir. 1994)(litigant is entitled to
> instruction that correctly reflects applicable law and sufficiently covers essential
> issues, but party is not entitled to prescribe exact language of that charge)."

*Douglas v. Owens,* 50 F.3d 1226, 1233 (3d Cir. 1995).

When the trial court refuses to give a requested jury instruction and there is an objection

to this decision, the refusal to give the proposed jury instruction is reversible error "only if the

omitted instruction is legally correct, not substantially covered by other instructions, and so

important that its omission prejudiced the defendant."  *United States v. Brooks*, No. 09-2097,

2009 WL 3724976 at *5-6 (3d Cir. November 9, 2009).

*A. The Proposed "Error of Judgment" Instruction Was Not Required.*

In their proposed jury instructions, Defendants requested that an "error of judgment" charge be given advising the jury that a medical professional is not liable for a mere mistake or error in judgment. The requested instruction was included in the original jury charge. However, at the charging conference Plaintiffs' Counsel objected, arguing that it is reversible error to give the error of judgment instruction as set forth in *Pringle v. Rapaport*, 980 A.2d 159 (Pa. Super.), *appeal denied*, 987 A.2d 162 (Pa. 2009). *N.T. 12/21/10* at pp. 9-10.[8] I reviewed the *Pringle* case and removed the error of judgment instruction, over the objection of Counsel for Defendants. *Id.* at pp. 38-39.

Defendants have not met their burden of showing that the failure to give an error of judgment instruction warrants a new trial. The *Pringle* Court undertook an *en banc* review of "the history of the standard of care for physicians in Pennsylvania and the role of judgment in determining whether the standard of care has been violated." *Pringle,* 980 A.2d at 165 (Pa.Super. 2009). The *Pringle* Court determined that the Pennsylvania Supreme Court decisions in this area focused on "whether the physician violated the requisite standard of care, not whether he committed an error of judgment," and that the Pennsylvania Supreme Court "has never sustained, or even considered , the use of an 'error of judgment' instruction in a jury charge." *Id.* at 169, 175. Different Pennsylvania Superior Court panels "have addressed decisions of the trial courts either to give, or refuse to give, 'mistake of judgment' charges to juries, with essentially irreconcilable results." Noting that "the state of law regarding 'error of judgment' instructions [is] in flux," the *Pringle* Court sought to provide clarification and held that "'error of judgment'

---

[8] In the original jury charge, I included the following language: "However, health care providers are not liable for mistakes or errors in judgment, nor can they guarantee a result."

instructions should not be given in medical malpractice actions in this Commonwealth." *Id.* at p. 172. Thus, the requested "error of judgment" instruction is not legally correct.

Nor can Defendants establish that failure to give the "error of judgment" instruction prejudiced them because the jury charge as a whole adequately discussed the applicable standard of care and instructed the jury that "[t]he proper focus is whether the health care practitioner's conduct (be it an action, **a judgment** or a decision) was within the applicable standard of care." *N.T. 12/23/09* at p. 245.[9]

*B. The Proposed "Guarantor" Instruction Was Not Required.*

Defendant Coady argues that the Court erred in failing to instruct the jury that Dr. Coady is not a warrantor or guarantor. In his proposed jury instructions, Defendant Coady asked the Court to give the following charge:

> "Health care providers cannot and do not guarantee a successful result or the good health of a patient. An unexpected or unfortunate result in the course of medical or surgical treatment is not, in itself, proof of negligence, and it may not be considered as evidence of negligence. Even a disastrous result, by itself, neither establishes nor supports an inference of lack of due care on the part of a physician or other health care provider. The fact that the Plaintiffs allege that she suffered injury does not make any Defendant negligent. The question for you, ladies and gentlemen, is whether there was any negligence on the part of the Defendants, Paul M. Coady, M.D., Heart Care Associates and Cardiovascular Associates of Southeastern Pennsylvania, in the treatment of Plaintiff."

I declined to include this charge. As noted above, the original jury instructions included the following language, "However, health care providers are not liable for mistakes or errors in judgment, nor can they guarantee a result." At Plaintiffs' objection, I removed the entire sentence, including the guarantor language, based on my reading of *Pringle.*

---

[9]     Plaintiffs' Counsel sought to exclude the parenthetical language. Counsel for Defendant Coady argued that it should stay in, and I agreed. *N.T. 12/23/09* at pp. 78-79.

Defendant Coady has not met his burden of establishing that the failure to include his proposed guarantor language was error. The jury charge accurately discusses the applicable standard of care, and instructs the jurors that "[t]he mere happening of an injury or the fact that an unfortunate result follows a medical procedure does not establish negligence." *N.T. 12/23/09* at p. 245. The jury charge as given reflects applicable law and sufficiently covers the essential issues including the fact that a health care provider does not guarantee a result. There was no error.

C. *The Proposed "Superceding/Intervening Cause" Instruction Was Not Required.*

Defendant Coady argues that the Court erred in failing to give his proposed jury instruction on superseding intervening cause. In his points for charge, Defendant Coady asked that the Pennsylvania Suggested Standard Civil Jury Instruction on factual cause, 3.15 (CIV), be given. The requested 3.15 (CIV) was included in the jury charge. *See Pa. SSJI (CIV), §3.15 (2005);* and *N.T. 12/22/09* at pp. 247-249. Counsel for Defendant Coady submitted a supplemental point for charge on superseding intervening cause, requesting that the following instruction be given:

> "An intervening force is defined as an act that produces harm to Plaintiff after Defendants' alleged negligent act or omission. A Defendant may be relieved of his responsibility for his negligent conduct by an intervening act of a third party if that intervening act constitutes a superceding cause.
> The doctrine of superceding cause serves to totally relieve a tortfeasor from liability for a plaintiff's injury due to a subsequent, independent acct of negligence committed by a third-party. In other words, a superceding cause breaks the causal link between Defendants' conduct and Plaintiff's injuries so as to relieve the Defendant from legal liability for Plaintiff's harm.
> An intervening act becomes a superceding cause when the intervening act is so extraordinary as not to have been reasonably foreseeable. Superceding cause allows the unforeseeable acts of a third party, i.e. someone or something other than the Plaintiffs or the Defendants, to negate the Defendants' conduct as the

legal cause of the Plaintiffs' injuries. Thus, if you, the jury, find a superceding
cause, then the Defendants are relieved of any liability to the Plaintiff.
In this case, if you find that Defendant Coady was negligent and you also find that
the actions of Dr. Perez were negligent and not foreseeable to Dr. Coady, then you
have found a superceding cause and must return a verdict in favor of Defendants
Paul M. Coady, M.D., Heart Care Associates and Cardiovascular Associates of
Southeastern Pennsylvania. [citations to caselaw omitted]."

I declined to include the superseding intervening cause instruction in the jury charge,

concluding that the factual cause instruction was sufficient. *N.T. 12/21/09* at p. 40.

Defendant Coady argues in his post-verdict motion that "the trial court erred by not

instructing the jury that if they found that Defendant Coady was negligent and if they also found

that the actions of Dr. Perez were negligent and not foreseeable to Dr. Coady, then this would be

considered a superseding cause and therefore a verdict must be returned in favor of moving

Defendants." *Defendant Coady's Post-Verdict Motion* at p. 22.

I disagree. The Pennsylvania Suggested Standard Civil Jury Instruction on factual cause

which was requested by Defendant Coady was given to the jury. The Pennsylvania Suggested

Standard Civil Jury Instructions takes the position that a separate jury instruction on

intervening/superseding cause should not be given. *See Pa. SSJI (CIV), §3.18 (2005)*. In the

commentary to §3.18, the Committee states: "'Factual cause' as charged under Instruction 3.15

should satisfy all of the requirements of a charge where there is an issue of superceding cause."

*Id.*

I find that the charge in this case properly instructed the jury that it could find that: (1) the

conduct of a particular Defendant was a factual cause of Plaintiff Tina Thomas' harm only when

it determined that the negligent conduct of that particular Defendant was an actual real factor in

causing Tina Thomas' harm, and (2) that the negligent conduct of a particular Defendant need

not be the only factual cause of Tina Thomas' harm. The jury charge accurately focused the jury on whether the negligent conduct of each Defendant was, in fact, a factual cause of Tina Thomas' injury. An additional charge on superceding or intervening cause was not necessary and would only have added confusion. The jury charge as given reflects applicable law and sufficiently covers the essential issues including the fact that only those Defendants whose conduct was a factual cause of Tina Thomas' harm could be held liable. There was no error in failing to give a superseding cause instruction.

    4. <u>A New Trial Is Not Warranted For Alleged Attempts By Plaintiffs' Counsel</u>
<u>To Inject Corporate Liability Into The Trial.</u>

Defendant Lankenau Hospital argues that Plaintiffs' Counsel improperly attempted to inject corporate liability issues into this case, despite the fact that all corporate liability claims were dismissed prior to trial. According to Defendant Lankenau Hospital, the cumulative effect of these attempts - in Plaintiffs' opening statement, examination of witnesses and closing - prejudiced the jury by insinuating that the "hospital violated its own rules," and that hospital counsel was hiding the truth from the jury. *Defendant Lankenau Hospital's Post-Verdict Motion* at pp. 26, 32.[10] In support of this assertion, Defendant Lankenau Hospital points to the "excessive nature of the verdict," and "the fact that the hospital - a tangential defendant - was

---

[10] Defendant Lankenau Hospital cites to four layers of prejudicial conduct - during opening statement, during cross-examination of Dr. Morris (Defendants' cardiology expert) and Defendant Dr. Coady, during direct examination of Dr. Janzer (Dr. Coady's partner), and during closing argument.

found to be 83% responsible - approximately eight times the amount attributed to the attending physician, in what was clearly a 'doctor's case'." *Id.* at p. 26.[11]

During Plaintiffs' opening statement, Counsel referred to "rules that doctors must follow." All references to "rules" were to alleged violations by Dr. Coady and Dr. Joshi for failing to "do their jobs." Plaintiffs asked the jury to hold Dr. Coady and Dr. Joshi responsible for the injuries to Tina Thomas caused by their failures to follow the rules. *See N.T. 12/15/09* at pp. 13, 15, 30, 31, 33, 34, 36 and 44. There was no mention of Lankenau Hospital policy or procedures, nor were there any objections to comments made during Plaintiffs' opening statement.

Dr. Morris was accepted as Defendants' expert in the fields of cardiology and interventional cardiology. *N.T. 12/21/09* at p. 51. During cross-examination of Dr. Morris, Plaintiffs' Counsel attempted to query this witness about "Lankenau Hospital rules," and

---

[11]     Defendant Lankenau Hospital argues:

"It is not only 'reasonably probable,' but highly likely, that the size of the jury's verdict, and the amount allocated to Lankenau Hospital, was the result of plaintiff's counsel's improper references to the hospital's failure to follow the rules. Since there was no viable corporate liability claim, plaintiffs' attempted use of the hospital policies did two things - it was part of the theory that the hospital 'violated its own rules' and it put hospital counsel in a bad light by properly objecting. Although the objections were properly sustained, the jury was left with the impression that defense counsel was hiding the truth. The sheer magnitude and excessive nature of the verdict, and the disproportionate share allocated to Lankenau Hospital, are clear and convincing evidence of the impact of plaintiffs' counsel's conduct on the jury. Because there is not only a 'reasonable probability,' but a strong likelihood, that plaintiffs' counsel's attempts to inject corporate liability issues into this case influenced the jury's deliberations and verdict, a new trial is warranted."

*Id.* at 33.

attempted to show Dr. Morris part of Lankenau Hospital's policy and procedure manual.

Counsel for Defendant Lankenau Hospital objected; the objection was sustained. The hospital's

policy and procedure manual was not shown to Dr. Morris and was not published to the jury. *Id.*

at pp. 101-104.[12]

During the cross-examination of Dr. Coady, Plaintiff's Counsel queried this Defendant as

follows:

| | |
|---|---|
| "Ps' COUNSEL: | Does Lankenau Hospital encourage open communication and education between patients and physicians and nurses and technicians and family members? |
| DR. COADY: | I would think that every institution supports that or tries to encourage that. |
| Ps' COUNSEL: | Is that specifically the mission of the cardiac catheterization laboratory at Lankenau? |
| COUNSEL FOR LANKENAU: | Objection. |
| COURT: | On what basis? |
| COUNSEL FOR LANKENAU: | There's no testimony to support any criticism regarding the mission of the cardiac cath lab at Lankenau Hospital. |
| Ps' COUNSEL: | No one's criticizing the mission, Your Honor. I'm just asking the doctor about communication. |
| COURT: | Well, my problem – I don't have any problem with the |

---

[12] Defendant Lankenau Hospital argues that on the following day, "Plaintiffs' Counsel again raised the issue of hospital policy with the court 'to complete the record,' to which the court responded, 'I don't think it's your case.'" *Defendant Lankenau Hospital's Post-Verdict Motion* at p. 30. This exchange involved an improper attempt by Plaintiffs' Counsel to introduce evidence after she rested Plaintiffs' case, which I did not permit. *N.T. 12/22/09* at pp. 3-4. It occurred while the jury was not present in the courtroom and, therefore, could have no affect on them.

concept of communication.  The – the problem I have is the word 'mission.'  It sounds like it might come from a document.

If it's just an ordinary word rather than a word of art, I'll overrule it.  If in fact, you're in some way referring to some code or professional statement, then there's no foundation."

Ps' COUNSEL: Your Honor, I'm referring to the rules of Lankenau Hospital which I'm happy to show to the doctor."

*N.T. 12/22/09* at pp. 147-48.  At this point, both Defense Counsel objected and requested a

sidebar.  During the sidebar, Defense Counsel noted that the blow up of the exhibit that

Plaintiffs' Counsel wanted to show Dr. Coady was "facing forward."[13]  There was no request to

---

[13]     The following exchange occurred at sidebar:

"COUNSEL FOR
LANKENAU:          I object to it being shown.
COURT:             Oh, it's not being shown.  Counsel, don't show that document until we straighten this out.

COUNSEL FOR
COADY:             She's got it –
COUNSEL FOR
LANKENAU:          She's got it facing him.
COUNSEL FOR
COADY:             – facing forward.
COURT:             What?
COUNSEL FOR
COADY:             It's facing forward.
COURT:             What's going on?  What's going on, counsel?
Ps' COUNSEL:       Could you put the noise on, please?
COURT:             Excuse me?
Ps' COUNSEL:       Could you put the noise on?  I think the jurors can hear what you are saying.
COURT:             Oh, all right.  Do you want to put white noise on, please?  Thank you."

*N.T. 12/22/09* at p. 149.

move the exhibit, nor is it clear whether the jury could see the exhibit. There was no request for a curative instruction. The transcript does not reflect, but Counsel for Lankenau Hospital represents, that Plaintiffs' Counsel walked over to the exhibit and turned it over. *Defendant Lankenau Hospital's Post-Verdict Motion* at p. 30.

I sustained the objection and the exhibit was not shown to Dr. Coady or the jury. *N.T. 12/22/09* at pp. 153-54.

During the direct examination of Dr. Janzer, Plaintiffs' Counsel asked this witness about his practice and how he handled problems after cardiac catheterizations. There was no objection from Counsel for Lankenau Hospital as to this line of questioning , nor was there any objection from Counsel for Dr. Coady. *See N.T. 12/17/09* at pp. 48-52.[14]

During closing argument, Plaintiffs' Counsel told the jury that Dr. Coady, Dr. Joshi and Lankenau Hospital were being sued because "they broke the rules." These "rules" were characterized by Counsel as "patient safety rules." *N.T. 12/23/09* at pp. 145-46, 154, 169, 172, 188-89.[15]

———————————————

[14]    Defendant Lankenau Hospital argues that Dr. Janzer was also asked to give opinions as to his own personal practice at pp. 60-61. I have reviewed the cited testimony and find that the questions addressed to Dr. Janzer were focused on Tina Thomas' situation and not Dr. Janzer's personal practice. *See N.T. 12/17/09* at pp. 60-61.

[15]    At various points in her closing argument, Plaintiffs' Counsel recited the following "rules:"

> "A doctor must never needlessly endanger a patient." *N.T. 12/23/09* at p. 145.
> "A doctor must rule out the worst possible causes of this patient's problem first."
> *Id.* at p. 146.
> "When there is a restricted blood flow in the artery after a cardiac catheterization, a doctor must rule out a dissection." *Id.*

Plaintiffs' Counsel equated these "rules" with the applicable "standard of care:"

> "There is a dispute in this case as to what the standard of care should be. We believe the standard of care requires patient safety. A doctor must never needlessly endanger a patient, and when there is restricted blood flow in that artery after a catheterization, a doctor must rule out a dissection, and when there is a problem a doctor must get that patient back urgently.
> The defense says that is not the standard of care, and that is for you to decide. Is the standard of care one that protects patients, or is the standard of care one that protects doctors and hospitals who don't protect patients?
> Tina trusted Dr. Coady and Dr. Joshi and Lankenau Hospital. She trusted them. She trusted them with her life and Dr. Coady and Dr. Joshi and Lankenau Hospital broke that trust.
> Dr. Coady and Dr. Joshi and the nurses did not do their jobs in this case. They broke the patient safety rules, and we have those rules for a reason.
> You folks as the jurors in this case, you are the voice of the conscience of this community. You are the enforcers of the rules here. That is really what it comes down to. Tina Thomas put her trust and her faith in the defendants' hands and they violated that trust and they broke the rules and they continue to this day to refuse to accept responsibility."

*N.T. 12/23/09* at pp. 188-189.

There was no mention by Plaintiffs' Counsel of hospital policy. There were no objections during Plaintiffs' closing argument.

The jury charge accurately stated the applicable standard of care, and reiterated that Defendant Lankenau Hospital could only be found vicariously liable if the Plaintiffs established by a preponderance of the evidence that an agent of Lankenau Hospital who provided care to

---

"When a patient has pain in their leg or difficulty walking after a catheterization that patient needs to be seen urgently." *Id.*
"A doctor must never needlessly endanger a patient, and when there is restricted blood flow in that artery after a catheterization, a doctor must rule out a dissection, and when there is a problem, a doctor must get that patient back urgently." *Id.* at p. 188.
"That is the standard of care. That is patient safety rule. Rule out the dissection. They didn't do it." *Id.* at p. 230 (rebuttal).

Tina Thomas was negligent. *N.T. 12/23/09* at pp. 244-247. The jury was asked to decide if Dr. Coady was its ostensible agent, and gave the applicable legal standard. *Id.* at pp. 246-247.

The jury verdict sheet included a question as to whether Dr. Coady was the ostensible agent of Lankenau Hospital. The jury found that he was. *N.T. 12/29/09* at p. 63.

I find that Plaintiffs' Counsel did improperly attempt to introduce Lankenau Hospital policies during the cross-examination of Dr. Coady. However, Defendants' objection to this attempt was sustained, and the purported hospital rules were not shown to Dr. Coady nor were they published to the jury. There is no evidence of record to suggest that the jury actually saw the blow-up which was left "facing forward" while the issue was being addressed at sidebar. I do not find that Plaintiffs' Counsel's references to "the rules" and "patient safety rules," "had the tendency to inject corporate liability issues in the case." *See Defendant Lankenau Hospital's Post-Verdict Motion* at p. 29. Plaintiffs' Counsel characterized the applicable standard of care as "patient safety rules," and did not suggest that violation of Lankenau Hospital policy was a basis for assessing liability against the Hospital.[16] There is no support in the record for Defendant Lankenau Hospital's argument that there is a "strong likelihood that Plaintiffs' Counsel's attempts to inject corporate liability into this case influenced the jury's deliberations and verdict." *Id.* at p. 33. I will, therefore, deny the request for a new trial.

---

[16]During closing argument, Counsel for Lankenau Hospital argued that "[t]he standard of care is not patient safety rules. The standard of care is what accompanied Dr. Coady and Dr. Joshi into that catheterization room that day, January 23rd, and the standard of care is what an expert is required to come and tell you. It is what the conduct of a doctor must be, and the standard to which they are held by their peers, by the people that judge them, by the people who train them, by the people that practice and do the things that they do. [ . . . ] The standard of care and medical standard of care, it is not Dr. Janzer, it is not patient safety rules. It is a professional standard of care." *N.T. 12/23/09* at pp. 209-210.

**C. The Jury Award For Non-Economic Damages Is Excessive And Will Be Remitted.**

In an Order dated January 8, 2010, I noted my "serious concerns that the amount of the jury award in this case is excessive," and asked the parties to address the issue of remittitur. *See January 8, 2010 Order* [Docket Entry No. 129].

The Defendants have argued that a new trial is warranted, however, should the Court deny the request for a new trial, "a substantial remittitur of the jury's excessive award for non-economic damages is warranted." *Defendant Lankenau Hospital's Post-Verdict Motion* at p. 7; *See Defendant Coady's Post-Verdict Motion* at p. 7.

Tina Thomas testified that immediately after the cardiac catheterization procedure her right leg was "just really tired," and as the days went on "that turned to pain." *N.T. 12/18/09* at p. 22. After Dr. Uribe's procedure on February 3, 2006, Mrs. Thomas felt "immediate relief," and felt "completely better and back to normal." *Id.* at p. 32. In the first week after February 3, 2006 procedure, Mrs. Thomas noticed that as she "got doing things," "although it was much improved [she] was still stuck with a lot of weakness." *Id.* at p. 120. Mrs. Thomas tried physical therapy to strengthen her leg but within six weeks she stopped physical therapy because the physical therapist said they weren't making any progress "since it was a nerve issue and not a muscle." *Id.* at 121.

According to Mrs. Thomas, she continues to have "constant pain," which can increase with activity. She tires easily and her right leg feels colder than the rest of her body, "it just feels like it is wrapped in ice all the time." *Id.* at p. 124.

When Mrs. Thomas went to her mother's condo at the beach in the summer of 2009, she had to walk down ten flights of stairs after the fire alarm went off. She made it down the steps but was "pushed over to the side with all of the old people." She can go out in public with a walker but it makes her feel "worthless." Mrs. Thomas who was used to caring for everyone else doesn't like people taking care of her. *Id.* at 126. She really misses her prior work as an ICU nurse, it was "a perfect job." She has tried to find other nursing work but has not been able to find employment that will meet her limitations as to walking and driving. *Id.* at 128.

Mrs. Thomas spends about half the day in her bedroom. She uses the computer, pays her bills, does her exercises and visits with people in her bedroom. Plaintiffs' king-sized bed has been moved out, a hospital bed has been moved in, and Mr. Thomas sleeps on a sofa in the bedroom. *Id.* at pp. 133-34.

According to Mrs. Thomas, "on a good day, laundry at [her] house is 24/7." Doing laundry is like "recreation," and Mrs. Thomas gets exercise walking to and from the machines but can't carry the basket of folded clothes. She can vacuum but can only go half the distance before she gets tired out. She has trouble carrying the grandkids, but can push them in an umbrella stroller around the house. *Id.* at pp. 135-136. Mrs. Thomas occasionally drives, with another driver in the car in case she gets tired, to the grocery store. *Id.* at 140.

Mrs. Thomas takes Neurontin and Tylenol with Codeine for pain and was scheduled to meet with a pain management doctor after trial. She testified that her ongoing pain is "like a constant aching like from hip, not [her] hip but the top of [her] thigh, like all the way down [her] calf and that aching gets worse or less depending on what [she is] doing." *Id.* at p. 138. The biggest change in her life is a loss of freedom. When she goes out now, she has to plan everything out to make sure she can do it. *Id.* at pp. 139-140.

Tina Thomas' family members, her husband and her mother, testified as to her on-going condition. Mrs. Thomas' mother, Alice Cordrey, described the biggest change in Tina after the procedure as depression, noting that she is no longer "her happy jolly self." *Id.* at p. 209. Her husband, Robert Thomas, testified that Tina was "devastated" when she accepted that her right leg would not get better. *N.T. 12/18/09* at p. 179. He confirmed that Tina spends a lot of time in her bedroom, using the computer and telephone to communicate and doing things for her family members. According to her husband, Tina has good days and bad days, and on the bad days she is depressed and doesn't want to go anywhere. *Id.* at p. 184, 186. Tina still does a little bit of housework, but now her husband and kids help out. She used to do a lot of cooking but now only does about 25-50% of it. *Id.* at pp. 184-185. Tina is much less independent now, and has "lost out on a lot of activities" with her children and grandkids. *Id.* at p. 188.

On the basis of the record, I conclude that the jury award of $2,225,000.00 for non-economic damages is clearly excessive and is wholly unsupported by the evidence. Under these circumstances, I find that a remittitur is appropriate.

Turning to cases in which courts in this Circuit have determined that jury awards exceeded the maximum recovery that was reasonable given the extent of a particular plaintiff's injuries, I find some guidance for evaluating the "maximum recovery that does not shock the judicial conscience." *See Maylie v. National Railroad,* 791 F.Supp. 477, 483 (E.D. Pa.), *aff'd*, 983 F.2d 1051 (3d Cir. 1992).

In *Maylie,* the District Court remitted a $2 million award for pain and suffering to $550,000.00, where there was substantial evidence of plaintiff's continuing pain from a back condition "so severe that he could not sleep and was unable to relieve the pain by either sitting,

standing or lying down," and evidence that after engaging in physical activity, plaintiff's pain made "further activity impossible for a period of time." There was evidence that plaintiff's back condition required three episodes of hospitalization (including two surgeries) and that his condition and pain resulted in nervous conditions that required psychiatric treatment and hospitalization. *Maylie*, 791 F.Supp. at 483-484 (E.D. Pa. 1992).

In *Grazaini v. Star Trucking*, the District Court remitted a damage award for pain and suffering of $600,000.00 to $375,000.00. The *Grazaini* Court determined that the plaintiff's back injuries were permanent, caused her to experience limitations in her daily activities and problems with her family, and resulted in an inability to work for a period of time. *Graziani*, 1996 WL 79975 at *7 (E.D. Pa. February 22, 1996), *aff'd*, 103 F.3d 112 (3d Cir. 1996).

In *Rivera,* the Third Circuit affirmed the trial court's refusal to remit a pain and suffering award of $250,000.00 where the evidence showed that the plaintiff sustained a herniated disc with neurological involvement, continuous pain, urologic problems and inability to engage in practically any activity, and the plaintiff's condition was permanent and likely to worsen with age. *Rivera*, 854 F.2d at 28 (3d Cir. 1988).

Based on the evidence in the record, construed in light of the rough guidance of the above caselaw, I conclude that the maximum amount a jury could properly award for Tina Thomas' non-economic damages is $500,000.00. Accordingly, Plaintiffs will be ordered to remit $1,750,000.00 of the jury's award for non-economic damages. If Plaintiffs choose not to accede to the remittitur, a new trial on the issue of non-economic damages will be held.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TINA K. THOMAS, et al. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PAUL M. COADY, M.D., et al. | : | NO.   08-339 |

## **O R D E R**,

AND NOW, this 23nd day of April, 2010, consistent with the above discussion, it is hereby **ORDERED** that:

(1) The Motion Of Defendant, Main Line Hospitals, Inc. d/b/a The Lankenau Hospital, For New Trial Or, In The Alternative, For Remittitur And Renewed Motion For Judgment As A Matter Of Law [Docket Entry No. 147] is **GRANTED IN PART, DENIED IN PART** as follows.

(2) The Motion Of Defendants, Paul M. Coady, M.D. And Cardiovascular Associates Of Southeastern Pennsylvania, For A New Trial Or, In The Alternative, For Remittitur And Renewed Motion For Judgment As A Matter Of Law [Docket Entry No. 148] is **GRANTED IN PART, DENIED IN PART** as follows.

(3) Defendants' Motions for A New Trial are denied.

(4) Defendants' Motions for Remittitur are granted.  A new trial on non-economic damages will be held unless the Plaintiffs accept the remittitur of non-economic damages to a judgment amount of $500,000.00.   By May 14, 2010, Plaintiffs shall inform the Court in writing of their decision concerning the remittitur.

BY THE COURT:


 S/M. FAITH ANGELL                              
M. FAITH ANGELL
UNITED STATES MAGISTRATE JUDGE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**
**Robert N.C. Nix Federal Building**
**900 Market Street, Suite 211**
**Philadelphia, PA    19107**

**Chambers of**
**M. FAITH ANGELL**                                  P:    **(215) 597-6079**
**United States Magistrate Judge**          F:    **(215) 580-2165**


*__FAX / MAIL COVER SHEET__*

**CASE NO.**    08-339

**TODAY'S DATE**: April 23, 2010                **LAW CLERK'S INITIALS**: JJK


**VIA FAX:**

| **NAME** | **FAX NUMBER** |
| --- | --- |
| 1.     Bradley T. Beckman, Esq. | 215-569-8769 |
| 2.     James P. Kilcoyne, Esq./Jacqueline Drygas, Esq. | 610-825-3222 |
| 3.     Peter J. Hoffman, Esq./John A. Filoreto, Esq./ Eileen Lampe, Esq. | 215-851-8383 |
| 4.     Howard J. Bashman, Esq. | 215-830-1459 |
| 5.     Arlin M. Adams, Esq./Nancy Winkelman, Esq. | 215-972-7246 |